Davis, J.,
delivered tbe opinion óf tbe court:
On tbe 26tb of August, 1876, tbe claimant and tbe chief quartermaster of tbe Department of Dakota, on bebalf of tbe defendants, signed a written contract at Saint Paul, in Minnesota, whereby tbe claimant agreed to furnish to tbe defendants, at or near tbe mouth of Tongue Elver, in Montana Territory, 800 tons of bay, tbe delivery to begin on or before tbe 1st October, and also 6,000 cords of good soft wood; and that in case of failure on bis part to deliver any of tbe supplies tbe defendants might supply tbe deficiency, and that any moneys which might be due him from them might be used by them to pay tbe difference in cost. Tbe defendants, on their part, agreed that tbe 6,000 cords of wood might be cut on any part of tbe reservation at Tongue Eiver outside of a circle of half a mile from’ tbe adjutant’s office at that post, and that they would pay tbe claimant for tbe bay at tbe rate of $34.75 per ton and for tbe wood at tbe rate of $8.65 per cord.
Tbe claimant failed to deliver tbe bay, and tbe defendants supplied themselves with about 160 tons, which was enough for their wants. Tbe claimant cut and delivered tbe 6,000 cords of wood, tbe contract price for which amounted to $51,900. Tbe defendants claimed to apply to tbe payment of this tbe sum of $40,980.63, which they said was tbe difference in cost to them between tbe contract price of tbe amount of bay delivered to supply tbe deficiency and tbe sum they actually paid for it, and they offered to pay tbe claimant $10,919.37 in fall for tbe 6,000 cords of wood. Tbe claimant refusing to receive this in full, tbe case was referred to tbe Secretary of War, who directed tbe Quartermaster-General to pay tbe claimant tbe said sum of $10,919.37, as tbe department could allow no greater sum, and that, in order that tbe claimant might bring suit for tbe recovery of tbe alleged balance, be should be required- to receipt for tbe amount as found due and allowed by tbe War Department, and would not be required to execute a receipt in full of all demands under bis contract. The payment was made and the receipt given in accordance with tbe terms of this order.
Tbe claimant in this action seeks to recover—
1st. Tbe said sum of $40,980.63, which is admitted to be due him on bis wood contract if tbe defendants are not entitled to apply to tbé payment of tbe contract price of tbe wood tbe differ *106 ence between tbe actual cost of tbe bay and tbe contract price of tbe same.
2d. Tbe difference between tbe cost of cutting and hauling 1,50'0 cords of dry wood and 1,500 cords of green wood, tbe claimant having been required by tbe defendants’ agent to deliver 1,500 cords of dry wood as a part of said 6,000 cords.
3d. The loss to the claimant by reason of his teams remaining idle for ten days while tbe defendants’ agent was deciding-on what part of the reservation at Tongue River be Avould be allowed to cut.
4th. Compensation for tbe injuries which tbe claimant suffered by reason of bis being required to cut 3,300 of said 6,000 cords at a greater distance from tbe adjutant’s post than outside of a circle of one-lialf mile distant therefrom.
These claims are made under tbe contract. Tbe claimant further seeks to recover in this action—
5th. Tbe value of a steam bay-press and of a beater-press, his property, which came into tbe possession of tbe defendants’ agents at Fort Buford, and which they used there, and which, so far as appears, are still in their possession.
We will consider these claims in their order.
1. The claimant contends that bis contract to deliver bay at Tongue River, though general in form, was, in fact (and was understood by both parties to be) a contract to deliver certain specific hay, to be cut from a place known as Big Meadows, near Fort Buford, and to be transported thence by water to Tongue River. He maintains that he has the right to prove conversations which took place between himself and the quartermaster with whom tbe contract was made at tbe time of its signing, which, he says, substantiate this fact. He further contends that it was dangerous for transportation trains to travel during that season in that section of tbe country without a military escort; that his contract gave him the right to such protection to the extent of tbe power of tbe post commander; that be demanded such protection from tbe commandants of three different posts and all refused to furnish it; and that be was thereby released from his obligation to deliver hay under the contract.
The defendants maintain that the claimant cannot by parol evidence vary or explain the written contract, and that tbe refusal to furnish an escort did not relieve tbe claimant from bis obligation to deliver tbe hay.
*107 The question how far parol evidence may be introduced in actions at law to explain written contracts affords as wide a range of conflicting authorities as any subject that can come before a court. Happily this court is required by law to look to the highest Federal tribunal for its guidance, and when it finds light there, is not exx>ected to look elsewhere. The general doctrine of the common law on' this point is tersefy stated in a recent opinion of that court:
£iA written contract merges all previous negotiations, and is presumed in law to express the final understanding of the parties. If the contract did not express the true agreement, it was the claimant’s folly to have signed it. The court cannot be governed by any such outside considerations. Previous and contemporary transactions may be very properly taken into consideration to ascertain the subject-matter of a contract and the sense in which the parties may have used particular terms, but not to alter or modify the plain language which they have used.” (Brawley's Case, 96 U. S., 173, 174.)
The case of Bradley, plaintiff in error, v. The Washington, Alexandria and Georgetown Steam Packet Company, defendant in error (13 Pet., 89), explains what the court mean when they speak of the 11 subject-matter of a contract and the sense in which the parties may have used particular terms.”
On the 19th November, 1831, the plaintiff in error entered into the following written agreement with the defendant in error: “I agree to hire the steamboat Franklin until the Sidney is placed on' the route, to commence to-morrow, 20th instant,- at $35 per day, clear of all expenses other than the wages-of Captain Nevitt.” The Franklin was placed on the route on the 20th November, and continued running until the 5th December. Navigation was then closed by ice, and continued closed until the 5th February, 1832. The Sidney was placed on the route on the 7th February. The owners of the Franklin sued in as-sumpsit to .recover the per Mem contract price’for the Franklin up to and including the 6th February. In order to explain the subject-matter of filie contract and the sense in which the parties used the particular terms, Bradley offered to prove certain facts, which are recited in the opinion of the Supreme Court. The court below refused to permit these facts to be proved. The Supreme Court, in reviewing the decision of the court below, laid down the following propositions:
*108 “ It is a principle recognized and acted upon by all courts of justice as a cardinal rule in the construction of all contracts, that the intention of the parties is to be inquired into, and, if not forbidden by law, is to be effectuated.
“ In giving effect to a written contract, by applying it to its proper subject-matter, extrinsic evidence muy be admitted to prove the circumstances under which it was made whenever, without the aid of such evidence, such application could not be made in the particular case.”
Applying these principles to the particular case, they said: “ Had the evidence been received, it would have disclosed the following state of facts : That the route mentioned in the contract was one on which the plaintiff in error transported passengers and also the mail; that the steamboat Sidney mentioned in this contract was designed to perform this service; that the Franklin was wanted for the same purpose; that the Sidney was then at Baltimore for the purpose of being fitted with her engines and equipments; that, although the transportation of passengers and the mail was carried by the plaintiff in error by a steamboat while the river was open, yet when the river was closed by ice so that navigation was obstructed, the plaintiff in error, then transported passengers and the mail all the way overland to Fredericksburg; that when the river was thus obstructed the plaintiff in error did not and could not use a steamboat; and that all these facts were known to the defendant in error! We think this evidence ought to have been received, because it would have tended to show, by the circumstances under which the contract was made, what was the intention of the parties, and, in the language of the rule which we have laid down, that the contract, without its aid, could not be applied to the proper subject-matter.. * * * The subject-matter of the contract was not merely the steamboat Franklin, but the steamboat Franklin under the circumstances under which it was hired. The -parol evidence, then, in this case was admissible, because without its aid the written contract could not be applied to its subject-matter.”
In order to determine whether these principles are applicable to the present case, we must first ascertain what the findings show to have been the subject-matter of the contract between these parties. Having ascertained that, we shall be in a position to determine whether they can properly be taken into considera *109 tion in construing' the contract and in applying it to its subject-matter.
The following propositions are clearly established by the findings :
1st. Prior to the year 1876 the Sioux Indians were in the habit of wintering in the valley of the Yellowstone. In the summer of that year there existed between them and the United States a state of war made memorable by the massacre of the gallant Custer and his command. Soon after that appalling event it ivas determined to maintain a cavalry and infantry garrison in the heart of the Yellowstone at its junction with Tongue Eiver, and another garrison at Glendive, about one hundred miles lower down the river. The short summer season was already far advanced when this decision was reached. The proposed new settlement at Tongue Eiver was five hundred miles removed from any settlement which could furnish supplies or teams for their transportation and still further removed from a market.
2d. Cavalry garrisons at remote stations are ordinarily supplied with hay cut from neighboring Government lands. On the 9th August, 1876, the chief quartermaster of the Department of Dakota ordered the grass on the tract called the Big Meadows, about twelve miles from Fort Buford (which is situated opposite the junction of the Yellowstone and the Missouri), to be cut for the use of the garrison at Tongue Eiver. The order went by letter to the regimental quartermaster at Fort Buford, who, on receipt of it, contracted with parties there, by the name of Leighton & Jordan, to cut the said grass for that purpose; and in pursuance of that contract the grass ivas cut accordingly. In the emergency the quartermaster also wrote to ’’several contractors, among whom was the claimant, inviting proposals for supplying hay and wood at Tongue Eiver. The claimant made proposals which were accepted, and on the 26th August the contract on which this suit is brought was signed at Saint Paul.
3d. At the time of signing said contract there was no grass in the valley of the Yellowstone suitable for making hay except on the said Big Meadows, and on some smaller tracts, which were subsequently cut for delivery at Tongue Eiver and charged against the claimant by the quartermaster. All the rest had been destroyed by the Indians. These facts had been reported *110 .to G-eneral Card, tlie chief quartermaster of the department, and were known by him when he made the said contract with the claimant. At that time both the claimant and General Card supposed there was no grass on the Yellowstone except at Big Meadows, and it was then intended by both that the said contract should be executed by cutting the grass on the Big Meadows, which was afterwards cut by Leighton & Jordan under authority derived from General Card. This was the only grass on or near the Yellowstone from which, after the arrival of the claimant’s teams at Fort Buford, it was practicable to make hay in time to have the deliveries begun on the 1st day of October, the day named in the contract for the commencement of the deliveries.
4th. At the time of signing the contract the claimant told the chief quartermaster that he did it under the expectation that the transportation between Fort Buford and Tongue Biver could be made by water; to which the quartermaster made no reply. At that time the chief quartermaster had reason to believe that the Yellowstone was not navigable above Glendive, but he did not communicate it to the claimant. Both parties then knew that if the transportation could not be made all the way by water, the transportation alone would cost the claimant a sum far beyond what he was to receive for the hay when delivered. In point of fact, the river was not navigable as far as Tongue Biver after September 1.
5th. Until the Gth of September the claimant or his agents did not know, and had no means of knowing, that the grass on the Big Meadows was being cut by order of said chief quartermaster. On that day a large force of the claimant’s men and teams arrived at Fort Buford from Bismarck, about two hundred and fifty miles distant, for the purpose of cutting the grass on the Big Meadows, and found Leighton & Jordan cutting it under the said contract made with them by order of the chief quartermaster. It was then too late for the claimant’s agent to return to the settlements with his teams and men and obtain hay there in time to commence the deliveries within the contract, term. The claimant’s agents made great exertions to find grass in the valleys of the Yellowstone and Tongue Bivers, but failed to do so, except for a small amount. The hay with which the deficiency was supplied was to a small extent furnished from grass cut in these valleys, and principally from the said hay made at Big Meadows for Tongue Biver:
*111 These are the principal facts in this case. They leave on our minds no doubt that the subject-matter of the contract, so far as it related to hay, was hay to be cut by the .claimant on the Big Meadows — the same hay which was cut by Leighton & Jordan under an agreement made with them by authority of the same quartermaster who contracted with the claimant. Guided by the principles laid down by the Supreme Court in the two cases we have cited and by their mode of applying the principles to the facts in the case of Peters, we are of opinion that the facts which we have recited must be taken into consideration in construing this contract, and that they establish that it was a contract for cutting and delivering that particular hay. The claimant was prevented from doing this by the act of the defendants. Upon the general principle that where one party to a contract prevents the other party from fulfilling his agreements no damages for the breach can be recovered, we are of opinion that the defendants wrongfully withheld from the claimant so much of the pay for the wood as they maintained was the difference in cost between the contract price of the hay and its cost to them.
This conclusion fully accords with the substantial justice of this case. In a time of pressing emergency the claimant responded to the Government’s call by placing his means and his energies at their service with unusual promptitude. In eleven days from the signing of his contract a large force of men, with all the requisite teams and tools, mowers and presses, had traveled 350 miles over the rough roads of an unsettled country and presented themselves at the Big Meadows for work. In eleven days more a like force, with the requisite means for cutting and hauling wood, had traversed the then dangerous country of the' Yellowstone and arrived at Tongue Biver. The authorities in the War Department were sensible of the value of such energy and zeal on the frontier. Being doubtful as to his legal rights, instead of deciding his claim adversely in the ordinary binding way, they took from him an unusual form of receipt, in order to leave him free to pursue his remedies here. If, in addition to the loss in bringing his forces to Fort Buford in vain, the letter of the law were to require this court to fine him over $40,000 for the non-delivery of 150 tons of hay, a great injustice would be perpetrated.
It is due to the officers who acted for the Government in this *112 matter to say that there is absolutely nothing in the record to warrant the strictures which were made upon them in the argument of the case by the claimant’s counsel. It was their duty, in an unusual and pressing military exigency, to spare no effort and omit no precaution in order to prevent the netv station at Tongue River from being without supplies when winter should set in. If, in the steps taken to insure this, two contracts were made applicable to the same thing, the defendants, when their contract with the claimant fell through in consequence of their own act, were subjected to no expense which they would not have been subjected to had the contract with the claimant never been made.
The view which we have taken renders it unnecessary to consider whether the condition of the Yellowstone, whereby navigation was made impossible, affected the claimant’s liability to perform his contract, or whether it was affected by the repeated refusals to furnish military escort, or what amount the defendants would have been entitled to retain if their views of their rights had been sustained. It is proper, however, to remark that the findings show that the claimant is entitled in any event to recover several thousand dollars on this branch of his case.
2. The claimant’s contract required him to deliver G,000 cords of good soft wood. The quartermaster at the post required him to cut and deliver 1,500 cords of dry soft wood as part of it. The claimant’s agent objected at first, but eventually delivered the required amount of dry wood, asserting a right to payment at a higher rate than for so much green wood.
We think the claimant must be paid for the dry wood at the same rate as the greenwood. Tongue River station was anew station, in a high latitude, where winters were long and severe.
These facts were known to the claimant; and as both the green wood and the dry wood were cotton (or soft) wood, and as the contract is silent on the subject, we think it reasonable to construe it as authorizing the defendants to require so much of the whole as was intended for the first winter’s consumption to be delivered in a kind of soft wood capable of immediate use, provided such wood could be found within the authorized distance.
3. When the claimant’s agent had finished cutting and hauling the dry wood the commandant was absent. The claimant could have proceeded to cut green wood from without the *113 reservation; but, in tbe bebef tbat on tbe commandant’s return be would be allowed to cut witbin tbe reservation, be preferred to wait. His teams were therefore idle of bis own choice. We think be cannot require tbe defendants to compensate him for this voluntary idleness.
4. Tbe claimant’s contract permitted him to cut tbe wood on any part of tbe military reservation at Tongue Fiver outside of a circle of one-half of a mile from tbe adjutant’s office at tbat post. He was required to cut, and did cut and haul, 3,300 cords more than half a mile from that post, and claims damages for this breach of tbe contract.
From their arrival at Tongue Eiver up. to tbe 25th October tbe claimant’s men and teams bad been employed in cutting and hauling tbe dry wood. From tbe 25th October till tbe 4th November they were idle, because in tbe absence of tbe commandant no wood could be cut witbin tbe reservation. On tbe return of tbe commandant they were allowed to cut, and did cut and haul, tbe 3,300 cords, as stated. Tbe claimant was put to a greater expense by reason of this ; but be acquiesced in tbe order of tbe post commander, and cut tbe wood outside of tbe line where bis contract requbed him to cut it, and hauled and delivered it without complaint, and made no claim to be paid for it until tbe defendants proposed to pay tbe wood contract by tbe damages on tbe bay contract. Tbe claim which be now sets up was an afterthought. With some hesitation we have reached tbe opinion tbat these facts bring tbe present case witbin tbe principles announced in’Francis’ Case (96 U. S.,, 359), and tbat tbe claimant is not entitled to recover on this account.
5. Tbe defendants’ contract with tbe parties who cut tbe bay at Big Meadows required tbat tbe defendants should furnish tbe machines for pressing and baling it. They bad no such machines at Fort Buford. Tbe claimant, however, bad forwarded thither two machines in tbe expectation tbat they would be used in bis bay contract. Not being so used, be asked permission to store them at Fort Buford. Tbe quartermaster assented, and offered to take charge of them. He also proposed to tbe claimant’s agent to buy them if be could get authority from bis superior, in order to use them in baling tbe bay at Big Meadows. He further proposed, in case be could not get authority to buy them, to hire them. Tbe claimant’s agent refused to *114 let them for hire, but offered to sell them. The chief quartermaster of the department refused permission for the purchase, but the agent had left Fort Buford before the answer came, and it was never communicated to him. Without further communicating with the claimant or his agent-, the quartermaster at Fort Buford used the claimant’s presses for that purpose, and when he had done with them left ¡them on the banks of the Missouri,. where they now are in a dilapidated condition. The claimant demanded .pay for the machines at their value. The defendants refused to pay for them as a purchase, but offered to pay for their use. The claimant refused to accept this, and brings this suit.
On the principles laid down by us in Mason’s Case (ante, p. 59), we are of opinion that the action can be maintained, and that the claimant is entitled to recover $387 as the value of the beater-press, and $1,746 as the value of the steam hay-press.
Judgment will therefore be eptered in favor of the claimant for the sum of $43,113.63. i