Campbell, Chief Justice,
reviewing the facts found to be established, delivered the opinion of the court:
The plaintiff entered into a contract with the United States to furnish a large amount of lumber, to be used in the construction of dams at Locks 3 and 5 in the Cumberland Liver. The contract was awarded him after due advertisement for proposals and a dozen or more bidders had submitted proposals. The specifications described the sizes and stated the purposes of the desired lumber.
Within a few days after the contract was made the plaintiff wrote Maj. Harts, defendants’ Engineer officer in charge, *440 calling his attention to the first clause of paragraph 22 of the specifications, stating his interpretation of the same and asking to be advised regarding the same. Maj. Harts replied to the effect that plaintiff’s interpretation was incorrect. In the plaintiff’s letter to Maj. Harts it was stated that the “sawyer” had raised the said question, and that plaintiff desired an explanation before cutting the material. It developed in the testimony that no sawyer had raised the question, but that it was a suggestion of plaintiff himself. Upon receipt of Maj. Harts’s letter the plaintiff went to Nashville and interviewed him in an effort to induce him to vary his construction of the specifications; and failing in that, the plaintiff proceeded with the completion of his contract. The lumber furnished according to Maj. Harts’s interpretation of the specifications was worth $6,200.50 more than a similar amount complying with the plaintiff’s interpretation would have been worth. Said sum is the principal item for which this suit is brought.
The paragraph of the specifications upon which the contention is based is as follows:
“22. All square lumber shall show heart on two sides and not less than one-half heart on the two other sides. All other sizes shall show at least two-thirds heart on faces and show heart at least two-thirds of the length on edges, excepting when the width exceeds the thickness by 3 inches or over; then it shall have heart on the edges for at least one-half the length.”
The claim is not made on account of any lumber except “the square lumber” mentioned in the first sentence of said paragraph, which comprised the heavier pieces described in the specifications. The plaintiff in his first communication to Maj. Harts thus stated his contention:
“We interpret the first half of the sentence referred to as meaning that there shall show some heart on two sides, which may mean any two sides, and that the heart showing on these two sides may be in any place. We interpret the last half of the sentence as meaning that half of the area of the sides in question shall show heartwood and that the heart may show in any place on the surface.”
Maj. Harts informed plaintiff that his interpretation was incorrect and that if it had been intended to provide as plain *441 tiff interpreted the phrase, the word “some” would have been inserted before “heart.” The plaintiff’s interpretation is, with some modification but practically the same, insisted upon here, and it is claimed therefore that plaintiff was compelled to furnish and did furnish a more expensive lot of lumber than the contract required.
1. In Moran v. Prather, 23 Wall., 492, an effort was made by the defendants therein to show that the phrase “steamboat debts” was a technical phrase and that it did not include any debts except such as constituted a lien on the steamboat. They offered to prove an established custom among steam-boatmen and merchants in New Orleans, where the contract had been made, to construe “steamboat debts” to be those only which could be enforced against the boat. The Supreme Court held that the testimony offered by defendants was properly excluded, and said (p. 503):
“Usage can not be incorporated into a contract which is inconsistent with the terms of the contract; or, in other words, where the terms of a contract are plain usage can not be permitted to affect materially the construction to be placed upon it, but where the terms are ambiguous usage may influence the judgment of the court in ascertaining what the parties meant when they employed those terms.”
In National Bank v. Burkhart, 100 U. S., 686, it was held, inferentially at least, that the usage relied upon must have been known to both parties to be of any binding force, and the court said (p. 692) :
“A general usage may be proved in proper cases to remove ambiguities and uncertainties in a contract or to annex incidents, but it can not destroy, contradict, or modify what is otherwise manifest. Where the intent and meaning of the parties are clear, evidence of a usage to the contrary is irrelevant and unavailing.”
Again in Moore v. United States, 196 U. S., 157, affirming this court upon that point, it is said (p. 166) :
“The effect of usage upon the contract of parties has been decided many times. It may be resorted to in order to make definite what is uncertain, clear up what is doubtful, or annex incidents, but not to vary or contradict the terms of a contract.”
*442 It was said in Barnard v. Kellogg, 10 Wall., 388, 390, that
“The proper office of a custom or usage in trade is to ascertain and explain the meaning and intention of the parties to a contract whether written or in parol which could not be done without the aid of this extrinsic evidence. It does not go beyond this, and is used as a mode of interpretation on the theory that the parties knew of its existence and contracted with reference to it.”
If, therefore, the meaning of certain terms used in a contract are uncertain or ambiguous, and have in the particular trade to which the contract refers a different meaning from the sense which they ordinarily import, evidence of the usage in such trade is admissible, but the fact of there being sueh custom or usage must be reasonably established, and that it was so far an established usage that the parties may reasonably be supposed to have known of its existence and to have contracted with reference to it. “ Such evidence may be introduced, to explain what is ambiguous, but is never admissible to vary or contradict what is plain.” The Delaware., 14 Wall., 579, 603. While there is some conflict in the evidence on that point it must be conceded that the weight of the evidence adduced is to the effect that the phrase “ shall show heart ” is recognized in the lumber trade as meaning show “ some ” heart, and that- the expression “ merchantable sawn timber shall show heart on all four sides ” does not mean that the lumber shall be all heart. Said expression occurs in what is called Mobile timber classification introduced in evidence by plaintiff.
Under the authorities cited above we must first inquire what is the meaning of the terms as used in the specification referred to, because if the meaning as there used is not uncertain or ambiguous we can not resort to the usage or trade meaning of the terms. Moore case, supra.
In ascertaining the meaning to be ascribed to said phrase we must consider the entire contract, its purposes, the surrounding circumstances, and the facts known to the parties, with reference to which it may be considered they contracted. We can not take a detached part of a specification or contract and give it a meaning that if standing alone it might receive *443 when upon examining the whole specification and contract and giving proper weight to the other considerations we have mentioned the meaning of the phrase in the particular contract appears to be different from what it might be under the usages of trade.
That the court may consider said matters in order to properly interpret a contract is well settled. Thus, in Prather v. Moran, 23 Wall., 492, 501, it was said:
“All the facts and circumstances may be taken into consideration, if the language be doubtful, to enable the court to arrive at the real intention of the parties and to make a correct application of the words of the contract to the subject matter and the objects professed to be described, for the law concedes to the court the same light and information that the parties enjoyed, so far as the same can be collected from the language employed, the subject matter, and the surrounding facts and circumstances.” Merriam case, 107 U. S., 437; Reed v. Insurance Co., 95 U. S. 23; Bradley v. Washington, etc., Pachet Co., 13 Pet., 89.
The principle was applied in Peck's case, 14 C. Cls., 84, 112, affirmed upon this point, 102 U. S., 64. The contract in that case required the delivery of “good” soft wood to be cut on a certain reservation. He was required by the officer in charge to deliver an amount of “ dry ” soft wood and claimed the extra expense of delivering dry instead of green soft wood, the dry wood being more difficult and expensive to obtain. The court held that, considering the purposes of the contract and the use of the wood, it was not unreasonable that the contractor be required to furnish the kind of wood that was needed for the contemplated use.
What, then, are the facts and circumstances of the instant case? The Government advertised for specified lengths and sizes of long-leaf yellow-pine lumber to be used in the construction of two dams at Locks 3 and 5 in the Cumberland River. It is well known to all lumbermen that sapwood pine lumber when subjected to the action of water quickly weakens and deteriorates. The specification in question called for the larger sizes of the lumber to “ show heart on two sides and at least one-half heart on the other two sides.” The remaining part of the specifications dealing with the *444 smaller sizes is not questioned. The lumber referred to was dimension lumber and was not merely “ merchantable ” lumber. It is apparent that specification 22 grades the lumber called for from the higher to the lower quality. This is certainly true as to the smaller sizes, and unless the plaintiff’s interpretation is to be accepted it is true as to the larger sizes, and being unquestioned as to the smaller sizes why should we put the qualifying word “ some ” in the description of the larger sizes required ?
The plaintiff contends that the plain meaning of the words used is that “ show heart ” means show “ some ” heart, but why some any more than “ all ” if a description is necessary to explain what he insists is a perfectly plain expression? The plaintiff would have us read the specification as meaning that the larger pieces should show some heart on some part or parts of two sides, though it requires that the pieces shall show heart on two sides. If the plaintiff had consulted the Interstate Rules for 1905, introduced by him in evidence, he would have seen that whereas that regulation provides that the lumber shall show “ two-thirds ” heart on two sides and not less than half heart on two other sides, the specification omits the limitation of two-thirds heart in said regulations entirely, and likewise in the balance of the specification the words are changed to indicate more certainly what was desired than the similar clauses in said regulations provide. When, however, counsel on the one side assert confidently that the “ plain English ” of terms is one thing and counsel on the other side with equal confidence assert the opposite we might be left in doubt were it not for the fact that the purposes of the contract and the use known to the contractor to which the lumber was to be put removes any cause for doubt, because it is not to be presumed that the specification intended or that the contractor supposed that the sizes of the lumber which would have to bear the greatest strain would be of worse quality and more inherently weak than the small sizes of the lumber were. It is in effect contended for the plaintiff that the largest- pieces of the lumber, 30, 50, and 60 feet long, to be used in constructing dams in a river, were authorized by the 'Specification to be inferior in quality, *445 weaker, and less desirable than the other lumber also described. We think the contention is unreasonable, and we also think that plaintiff’s action was thoroughly inconsistent with the contention he now makes. The practical construction which parties put upon terms of a contract which may be ambiguous or of uncertain meaning and hence of doubtful construction are entitled to great, if not controlling influence. Topliff v. Topliff, 122 U. S., 121; Gallaher v. District of Columbia, 19 C. Cls. 564; 124 U. S., 505. It was said in Merriam’s case, 14 C. Cls., 289, 302,
“ When the terms of a contract are ambiguous the parties may adopt such a construction as they expressly or by tacit concurrence agree upon, and after one of them has acted upon that construction, incurred expense, or done acts on the faith thereof, the other party can not set it aside and insist upon a different interpretation inconsistent therewith.” S. C., 107 U. S., 437. Otis case, 19 C. Cls., 467.
After the contract was awarded and executed the plaintiff made some question as to the interpretation of the first sentence in paragraph 22 of the specifications and asked the construction which the officer gave it. On receiving the officer’s rely he had an interview with the officer and urged his own interpretation. The officer adhered to his interpretation and notified the plaintiff to proceed with the contract, which the latter did. Thereafter as lumber was delivered and accepted, and upon seven different occasions the plaintiff was paid upon the basis of the contract price. Preliminary to payment by check a voucher was in each instance prepared in form of an account showing the items furnished, the dates of delivery, the sizes and lengths of lumber, the place it went, the number of feet board measure, the contract price’ per thousand feet and the amount, and any deductions made on account of cost of inspection. Ten per cent was withheld until the final payment, which was made in August, 1908. This final voucher showed some items of lumber furnished and the several amounts retained as aforesaid and a deduction for cost of superintendence and inspection. This latter charge only occurs on vouchers relating to deliveries after the expiration of the contract period. Upon several of said vouchers or statements of *446 account were items showing the very pieces of lumber which this case concerns. Upon each of said vouchers the plaintiff certified and signed a certificate that the account was correct and unpaid. He was paid accordingly and received final payment as stated. He made no protest, did not object to any payments being otherwise than they purported to be, and received and collected the final payment which was made, as the others were, by check, which purported to be in full of the amount stated in the voucher. The final payment was received in August and he presented the claim here sued upon to the War Department in March of the following year, more than six months after the matter had been closed. “It is therefore plain that the interpretation he now puts on his contract is an afterthought and is not the interpretation put upon it by the parties when it was executed” or when it was performed. Merriam case, 107 U. S., 478, 484.
In Walker v. United States, 148 Fed., 685, the plaintiff had contracted to furnish to the United States three wood-turning lathes for use at a navy yard. Being apparently in doubt as to the meaning of one part of the specification, he wrote the naval constructor and was informed specifically as to the requirement. He afterwards delivered the lathes in conformity therewith without objection, and also signed a voucher for the amount of the contract price without objection. It was held that conceding the contract to have been ambiguous the plaintiff was yet bound by the construction placed thereon by the Government, on which he acted in performing, and that he could not thereafter insist on a different construction and recover an additional sum on the ground that the lathes were more expensive than those called for by the specifications. To the same effect is Newman v. United States, 81 Fed., 122. See also C. M. & St. P. R. R. v. Clark, 178 U. S., 353, 369.
2. The items of deduction for cost of superintendence and inspection which plaintiff seeks to recover were shown on said vouchers, which were paid according to their terms. The contract fixed a time limit for the delivery of the lumber and provided for an extension, in which case the contractor *447 was to pay the said costs. The period was extended and the deductions for said expense were accordingly properly made.
3. The demurrage charges which plaintiff paid to the railroad company were not caused by the defendants. The contract provided for deliveries of the lumber upon barges in 100,000-foot lots. Pending the accumulation of the requisite quantity for delivery to the barges, plaintiff saw fit to leave the lumber on the cars and pay demurrage instead of unloading it. He can not recover for that item.
4. He claims for certain expense of rehandling and storing the lumber which was rejected and which he claims was on reinspection received. Included in that expense is the alleged cost of salary of his agent. The specification, paragraph 12, contemplates that he would keep an agent at said place, but aside from that we fail to see how the Government was at fault or caused the additional expense complained of. A considerable amount of the lumber tendered was rejected as not meeting the requirements of the specification. At plaintiff’s solicitation a reinspection was ordered, with the result that the officer in charge agreed to accept some of the lumber for shorter lengths, by cutting off the part objected to, and to accept other parts as inferior and at a lower price, to all of which plaintiff agreed. Some of the lumber which had been rejected was on the reinspection accepted, because it was desired to get the lumber without further delay, and though it did not comply with the specifications it was thought it could be used. It was finally accepted and paid for at the contract price. But none of the lumber had been improperly rejected in the first instance. Under these circumstances it can not be said that the Government was at fault or caused the said expense.
It follows that the petition should be dismissed, and it is so ordered.
All of the judges concur.