Baenet, J.,
delivered the opinion of the court:
This suit grows out of a contract for work upon Dam No. 6, in the Ohio River, about 30 miles below Pittsburgh. This contract was entered into on May 10, 1899, between Maj. William H. Bixby, of the Engineer Department, on behalf of the United States, and the Evansville Contract Company, now an insolvent corporation and whose affairs are now being administered and wound up by the claimant, Madison J. Bray, as trustee. The contract provided that work should be begun “ as soon as practicable,” the foundations to be *136 completed “ within nine months thereafter and the superstructure within a further twelve months.” Included within the work provided for in the contract was a large amount of concrete masonry, and it is this item which is the foundation of the controversy in this suit.
August 19,1901, for reasons therein stated, a supplemental agreement was entered into between the same parties relating to that part of the work contemplated by the original contract which had not then been completed. This supplemental agreement provided, among other things, that “ work under the said [original] contract should be terminated as soon as existing funds be used up, and that all payments due thereunder shall be made to the said contractors without delay.”
Paragraph 166 of the specifications, among other things, provided that the work “be conducted under the direction of the local engineer” of the defendant, “who shall have power to prescribe the order and manner of executing the same in all its parts; of inspecting and rejecting materials, work, and workmanship which, in his judgment, do not conform to the drawings that may be furnished from time to time or to those specifications.”
Paragraph 168 provided that the defendants should keep inspectors on the work, who should receive their instructions from the local engineer, and who should have power to object to any materials, work, or workmanship.
Paragraphs 130, 131, 132, 169, and 170 of the specifications are as follows:
“ 130. Mixing and placing. — The concrete is to be well and rapidly mixed by machinery, as may be required by the engineer, unless otherwise specified. It will be deposited in layers not more than 8 inches thick; wherever and whenever required the layers will be thinner than 8 inches, and all thoroughly rammed by such process as the engineer may approve.
“ 131. Courses. — In the piers and abutment the concrete shall be laid in courses of a thickness corresponding to the adjoining courses of ashlar masonry. It shall be filled in flush with the top of each course before the next course of ashlar above shall be laid.
“ 132. Dry surface.- — Before putting in the concrete of any course the bed and adjoining course of ashlar shall be thor *137 oughly wetted so that no dry surface may come in contact with the fresh concrete, destroying its power of adhesion by absorbing its moisture.
“ 169. Local engineer.- — The local engineer shall have power to overrule or rescind any or all objections or deci-cions of the inspector.
“ 170. Engineer officer's decision. — The decision of the United States Engineer officer in charge of the work shall be final and conclusive upon all matters relating to the work and upon all questions arising out of these specifications, and from his decision there shall be no appeal.”
Ii. E. Fulton was chief inspector in charge of the work for the defendants as contemplated by paragraph 168; William Martin was the local engineer in charge of the work as contemplated by paragraph 166; and Maj. William H. Bixby was the engineer in charge of the work as contemplated by paragraph 170.
The claim involved herein is for damages in the sum of $59,713.12, alleged to have been sustained on account of the manner in which said contract company was required by the chief inspector to lay the concrete masonry. It appears by the findings that- there are two well-recognized methods of laying concrete masonry, one known as the layer and the other known as the monolithic system. By the layer method the concrete is placed in layers varying from 7 to 9 inches in thickness, which are “rammed” and then allowed to stand for a time to “ set ” sufficiently hard to carry the “ ramming” of the next layer without injury. By the monolithic method the cement is placed in boxes, which are removed when the cement has sufficiently hardened, and it is filled in continuously until the monolith is completed. It will thus be seen that when the layer method is pursued and the courses of cement work are short, and a large force is employed, a considerable time to wait between courses will be required in order to allow the cement to “ set.”
The contract company was required to follow the layer system in doing the cement work under this contract, and the claimant now contends that this was contrary to the terms of the contract as well as the usages and accepted methods of doing such work; and that this method of doing the work caused the contract company great delay, which *138 resulted in the damages named. It is not questioned that the layer method in a work of this size and land is more expensive than the monolithic method, and the findings show that" the cost to the contract company in completing the contract was $37,731.12 more than it would have been had it been allowed to follow the monolithic method.
It seems to us too clear for argument that the paragraphs of the specifications relating to the cement work required it to be done according to the layer method, and to allow each layer to harden or “ set,” as it is called by the witnesses, before another layer was placed.
The claimant introduced evidence tending to show that it was the common usage in laying cement masonry to place one layer upon another without delay, and we have been asked to find to that effect. A custom may be shown to explain a written contract where its terms are doubtful, but where its terms are susceptible of but one meaning no custom or usage can vary them. (Pickley v. United States, ante, and cases cited.)
The findings show that the contract company had had other contracts with the Government for cement work before entering into the contract in question containing exactly the same specifications as to the manner of laying it, and that it had been required to lay it the same is in this case, the only difference being that in the former cases the courses of cement were longer and for that reason so long a wait between courses was not necessary. The consideration of this fact is permissible for the purpose of throwing light, if that were needed, on the contract involved in this case. (Ceballos v. United States, 214 U. S., 47.)
As to the question whether the inspector in immediate charge of the work required an unreasonable time for the cement work to harden, under the terms of the contract the decision of this officer was made final and conclusive; and in the absence of fraud or gross error as would imply bad faith, his decision can not be reviewed in this court. (Kihlburg v. United States, 97 U. S., 97; Driscoll v. United States, 34 C. Cls., 523; Bowe v. United States, 42 Fed R., 761.)
The findings show that while the contract company protested both to the inspector and the local engineer against *139 being compelled to lay the cement masonry as it was required to do, it never lodged any such protest with Maj. Bixby, the Engineer officer in charge of the work. The specifications made the latter officer the final arbiter “upon all matters relating to the work and upon all questions arising out of the specifications.” It will thus be seen that the contract provided a forum where the contract company could have gone and presented its grievances, but it failed to do so. We do not think it can now be heard for the first time to present these grievances in this court. (Bowe v. United States, 42 Fed. B., 761; Bigelow on Estoppel, 633.)
The petition is dismissed.