Green, Judge,
delivered the opinion:
This suit is brought by the plaintiff to recover $1,288,-328.10 claimed to be due it from defendant on a contract to manufacture cartridges and other war materials.
On July 20, 1917, the plaintiff entered into a contract (No. 14067) with the defendant for the manufacture of a very large number of cartridges. This contract was subsequently modified by six other supplemental contracts which greatly increased the number of cartridges to be manufactured and also provided for the manufacture of other war material. As so modified, the original contract and these supplements constituted in effect one contract and will be *120 so treated in this opinion. Before the plaintiff had finished the manufacture of the war material covered by the original contract and supplements thereto the contract was terminated by a notice given by the Government. There is no controversy but that plaintiff fully carried out the contract on its part except as directed by the cancellation, notice.
The original contract with the supplements are set out in exhibits attached to plaintiff’s petition which show that the contract was of the class or kind commonly denominated “ cost-plus contracts.” In a general way it may be said that it provided for the payment to plaintiff of all manufacturing costs with a percentage of profit, and also for the payment of certain other costs and in certain cases a percentage of profit thereon. As the parties dispute over the proper construction of the contract it becomes necessary to consider the circumstances under which the contract was made as well as the wording thereof.
Prior to the beginning of the World War the plaintiff was a manufacturer on a large scale of small arms and ammunition therefor, the value of its plant being about nine or ten millions of dollars. Between November 24,1914, and August 27,1915, plaintiff entered into several contracts with the British and Russian Governments for the manufacture of military rifles and cartridges at a fixed price. The amount of these contracts in round numbers was $40,000,000.
In order to perform these large foreign contracts it was necessary to greatly increase the capacity of its plant and purchase large amounts of additional machinery. These additions to the plant were connected with the original plant as much as practicable, but some buildings were not attached to the old plant. Most of the new machinery was placed in the additional plant, but some old machinery was put in the new part and some new in the original plant.
These contracts were not profitable, and in the spring of 1916 a supplemental contract was entered into which changed these contracts to actual-cost contracts with a further provision that all rifle machinery and equipment were to be paid for and retained by the British Government. A right of cancellation was also provided. In the fall of 1916 *121 these contracts were canceled. Plaintiff was paid the cost of all production and for the rifle machinery — in all about $32,000,000.
The total plant expansion during this time amounted in round numbers to $8,000,000. The machinery was not moved or dismantled by the British Government, and at the end of the year 1916 the plaintiff-, had-' on hand this very large plant with machinery owned by itself and the British Government, together with skilled and unskilled labor sufficient to operate the entire plant. It owed approximately $17,000,000, one-half of which represents the cost of the plant expansion, but its original plant was adequate for its commercial work, which was about the same as it had been before it had made the foreign contracts. The plaintiff was in a position to undertake at once the manufacture of orders for arms and ammunition on a large scale, with the exception that it did not own the new.rifle machinery, which, shortly after the United States entered the World War, had been sold by the British Government to the United States. As a natural consequence of entering into the World War this Government became in need of large quantities of ammunition, and its officers were acquainted with the facilities of plaintiff’s plant and its financial standing. Plaintiff held out as an inducement of the letting of large contracts to it its facilities and readiness to commence work at once, which undoubtedly was one of the reasons for the Government entering into the contract. In short, the plaintiff had on hand a large plant for which it needed large orders, which only the defendant offered, and the Government wished to place them where they could be filled with the greatest dispatch.
The plaintiff admits that the defendant has paid all that is due it under the contract except as to two matters which constitute the issues in the case, and are as follows:
(1) The plaintiff claims that it is entitled to recover the depreciation of value which it alleges it sustained with reference to its plant and machinery used in carrying out the contract from the time when the contract was entered into up to the time when it was terminated by direction of the defendant.
*122 (2)Plaintiff also claims that it is entitled to 10 per cent profit on the value of the unworked material purchased either by defendant or itself for use in performing the contract.
The contentions of the defendant may be summarized as follows:
(1) That when properly construed, the contract makes no provision for payment to the plaintiff of the depreciation in value of the plant and machinery used in the performance of the contract.
(2) That the evidence fails to show the amount of such depreciation and that it does not support the claim for 10 per cent profit on the value of the unworked material.
(3) That plaintiff, by submitting its claims to certain boards appointed for the purpose of hearing them and to the Secretary of War, is bound by the decision made by such boards and the Secretary denying it any further compensation.
(4) That in any event, plaintiff, having failed to ask that its claims be heard in the manner provided by the contract, can not now obtain relief in this court.
A determination of the proper construction of the contract, as applied to the claim of the plaintiff first above set out, presents a difficult question. It will be seen that as set out above what plaintiff really seeks to recover is the loss which it alleges it has sustained in the value of its plant and machinery used in carrying out the contract. It is true that plaintiff does not state its claim in that way, either in the petition or in the argument, but calls the amount which it seeks to recover “ depreciation of value ” which is calculated by plaintiff by determining the difference between the market value of the plant and machinery used in the contract at the time the contract was entered into and at the time when, the work terminated, as shown by plaintiff’s testimony. But this can not in the final analysis mean anything else but the loss in market value during this period. Ordinarily, this would not be called “ depreciation ” but “ amortization,” and that is what plaintiff’s own witnesses call it in their testimony. In connection with *123 manufacturing plants and machinery, depreciation ordinarily means the diminution in value by reason of wear and tear, the effect of the elements, and other similar causes, and does not refer to market value. The market value, notwithstanding this depreciation, might be higher than it was at the beginning of the use of the property, for while the proper estimate of market value will take into consideration what might be called “ ordinary depreciation ” there are many other factors to be considered which often have far more effect in the determination of market value. To some of these factors attention will hereinafter be called.
At this point it becomes necessary to consider particularly the language of the contract upon which plaintiff bases its claim for depreciation of value. As shown in Finding VII, Article XI of the contract provided:
“ The contractor will also be compensated for the use of its property and working capital employed and depreciation thereof, upon the basis of and to the extent that such items enter into ' normal costs ’ enumerated in paragraph (d) of this article.”
Paragraph (d) provided:
“ The expenditures or costs entering into the ‘ normal costs ’ per thousand cartridges are the following:
$$$$$$$
“(5) A reasonable allowance according to the conditions for depreciation of values of plant and property of the contractor.”
It will be observed in the first paragraph of that portion of the contract quoted that it provides, among other things, that the contractor will be compensated for the use of its property and working capital employed and depreciation thereof. If this is taken alone, or is considered controlling, the construction for which plaintiff contends could not be justified. In its common and ordinary use in connection with contracts, depreciation does not refer to a lessening in or loss of values, but plaintiff contends that the words which follow “ depreciation thereof ” in the paragraph referred to, to wit, “upon the basis of, and to the extent that such items enter into ‘ normal costs ’ enumerated in *124 paragraph (d) of this article,” determine the manner in which the word “ depreciation ” is to be construed. In this contention we are inclined to agree. The material provisions of paragraph (d) are set out above, and it seems to us that'the words “depreciation of values” standing alone can have but one meaning, which is that for which the plaintiff contends. True, the contract does not specify the period as to which this depreciation applies nor state to what property of the plaintiff it is to be applied, but these matters may be treated as understood between the parties. This is as far as the argument on behalf of plaintiff goes, and it seems to be thought that this construction would settle the matter, but it is far from doing it. There is other language in the immediate connection which determines what the amount of the award for “ depreciation of values ” should be, and in order to construe it we may properly consider all of the surrounding circumstances under which the contract was made.
It should be kept in mind that plaintiff had the plant and substantially all the machinery used in carrying out the contract before the contract with defendant was even proposed. Whether foreign governments paid for it or for any of the loss on it is not shown by the evidence, but it is quite evident that no good reason could be given why the United States should pay for the loss on a plant that had been erected under a contract with some other party, and if a contract was made on behalf of the defendant to do this the Government’s interests were very insufficiently protected by its officials.
It may be said that the court has nothing to do with this matter and that if the Government officials made a bad bargain for the Government, no matter how bad it may be, the Government is still bound. This in a general sense is true, but, nevertheless, where the language of the contract is ambiguous or doubtful in its meaning, the reasonableness or unreasonableness of a certain construction in the light of all the circumstances may be considered by the court as bearing upon what the parties intended, and the findings show that whatever plaintiff’s officers intended, the contract *125 ing officer on the part of the Government did not intend to make the defendant liable for decrease in value of the property.
At this point we turn again to the contract to consider subdivision (5) as a whole instead of merely the words “ depreciation of values of plant and property of the contractor.” On so doing, we find that it is not depreciation of value that is to be awarded to the contractor. If this was all that was intended, the words of subdivision (5) above quoted, should have been omitted and then the language would have expressed exactly that for which the plaintiff contends. Applying these words which unquestionably modify the expression “ depreciation of values,” it will be seen that the amount which is to be awarded is “ a reasonable alloxoance according to the conditions for depreciation of values of plant and property of the contractor.” (Italics ours.) The amount to be awarded was not the depreciation of value, but what would be a reasonable allowance therefor under all of the conditions. But this does not end all of the difficulties of construction of this language, for it is hard to say just how this clause should be applied. Under one view it does not seem to be reasonable to allow anything, but this provision would seem to provide for some allowance. But, if we inquire what would be a reasonable allowance under all of the conditions of the case, there appears to be no testimony on this point.
From what is stated above, the difficulties in properly construing the contract in respect to this matter are quite apparent and are such that we prefer to rest our decision upon another provision in the • contract- as to which the meaning is perfectly plain and which makes it unnecessary that we should reach a final determination as to whether the contract should be construed to require the plaintiff to be reimbursed for loss of market value.
The second defense made on behalf of defendant is that even if the contract be construed so as to permit plaintiff to recover the loss in value of its plant and machinery during the contract period, there is no evidence from which the court can determine the amount of such loss. In order to *126 pass on this contention it was necessary for the court to examine the testimony which was presented on this point by both plaintiff and defendant, but this testimony can not be related in detail here nor properly be included in the findings.
Plaintiff’s counsel have set out in their requested findings Nos. XXI and XXII the manner in which they claim their witnesses arrived at the market value of the plant additions as of July 1,1917, and July 1,1919. The statement is fairly correct as far as it goes, but, although it is about eight printed pages in length, it omits many matters of importance which are very material. None of it has any place in the findings because it is only an abbreviated statement of the evidence showing in general how plaintiff’s witnesses arrived at the sums which they stated to be the plant value, and not the ultimate fact or facts which the court is required to find from such testimony, and for this ultimate fact as we find it to be only a few words are required. As the conclusions which we have reached as to the ultimate fact are controlling as to an important phase of the case, we have thought it proper to give in part our reasons for reaching them. ■
The defendant’s objections to this testimony are two:
(1) That the method taken is faulty and therefore the testimony is incompetent;
(2) That conceding for the purpose of argument that the testimony is competent, it is overcome or at least nullified by the evidence given by the experts who testified on behalf of defendant.
A consideration of the testimony shows that it involved “ cost of construction,” “ depreciated cost,” “ cost trends,” “ accrued depreciation,” “ physical appraisals,” “ reproduction cost,” “ sound value,” “ replacement value,” comparison of values, ratio of sales price to “ sound value,” average of ratio percentages, and many other such matters in relation to which elaborate calculations were made and from which, as stated in plaintiff’s requested finding, it was found that the depreciation in value of the special plant applicable to the cost-plus contracts was $3,976,712, and the amount *127 “ which should be allocated to the contract sued upon on account of depreciation in value of the said special plant was 29.62% of $3,976,712, or $1,177,902.” This is not, however, the amount claimed in the petition, which is the result of a different computation and calculation.
Plaintiff’s witnesses testified that they have used a method approved by accountants and engineers in making this calculation, but the court is not concluded thereby, even if there was no testimony in rebuttal, since this is only the conclusion of an expert. This is especially true in this case where such testimony is rebutted by other experts who insist that plaintiff’s witnesses are in error, one of defendant’s witnesses going so far as to claim th'at a proper application of plaintiff’s theory would show that plaintiff, had been overpaid. We have examined with care the testimony which, including that of the plaintiff’s witnesses in explaining their-calculations and defending them and that of the witnesses of the defendant attacking the methods used by plaintiff’s witnesses and attempting to show that they were incorrect, fills about 200 printed pages. It is impossible in the reasonable lengths of an opinion to call attention to anything more than some of the objections to the methods used by plaintiff’s witnesses which appear to us to be quite serious.
In making the calculations and computations by which the amount of the claim set out in the petition was obtained, use was made of the original cost of the plant. Plaintiff’s expert witnesses, in testifying to a different calculation by which they made the amount of depreciation in value greater than that stated in the petition, did not make any use of the original cost of the plant, but in obtaining market value did use the cost of reproduction less depreciation (“ sound value ”). Use was also made of cost trends. It should be observed in this connection that “ sound value ” is not market value at all, but something very different; namely, reproduction cost less depreciation, and it is a matter of common knowledge that the cost of reproduction of a plant might be very large and yet the plant have practically no market value after it was reproduced. All of these mat *128 ters of cost were a part of the calculations of these witnesses, and without them their calculations amount to nothing. In other words, their calculations • are made to depend upon cost. It follows that unless this practice can be justified under the rules of evidence, their conclusions have no weight as evidence.
The commissioner found in substance that the market value was also arrived at by plaintiff’s witnesses taking sales of what the witnesses claimed to be similar property used for similar purposes and this “valuation was compared with the sound value (cost less depreciation) and the sales ratio taken for comparison.” Counsel for plaintiff dispute this statement, but it is supported by the evidence and also by plaintiff’s requested finding No. XXII, where it is said that a physical appraisal was made of “ selectéd properties to determine the cost of reproduction new, less depreciation (sound value or replacement value) at date of sale.” The same request also shows that this sound value was used in determining the ratio of sales price thereto in the years 1917 and 1919, and the average of these ratios ascertained. These ratios were used in computing the market values of plaintiff’s plant in 1917 and 1919. Although the market value of plaintiff’s plant was not computed directly from the figures for sound values of other plants, it was used in the calculations that led up to the final determination of market value. We very much doubt whether the market value of a particular plant can be found by a method which makes use of an average of the percentages which the reproduction cost of some other plants sustained to the market value of those plants.
Ordinarily, while cost may have some bearing on market value, market value can not be proved by offering evidence of cost alone, for such evidence omits or fails to give adequate weight to the principal matters which are determinative of value and which would influence an ordinary real-estate expert in giving his testimony thereon. A plant, or the machinery therein, may have little or no value regardless of the original cost, so also, although it might cost a large sum to reproduce it, its market value may be very small for a large number of reasons, none of which are *129 capable of being transformed into mathematical ratios, when compared with cost, which may properly be applied in determining the value of another plant.
It should also be noted that the witnesses for the plaintiff used what they called “ cost trends ” in their calculations, these cost trends having been made up by themselves. Against the calculations making use of these cost trends, the same objection arises in that market value is derived from cost. Costs may influence market values, but they can not determine them as a matter of evidence.
The testimony of the witnesses presented by defendant on the question of the amount of depreciation of value was offered not for the purpose of showing the correct amount of this loss or depreciation in value, but to show that the results obtained under the method used by plaintiff’s witnesses were incorrect. The witnesses used in general, or claimed to use, the theory of plaintiff’s witnesses but said it had been improperly applied in certain respects. It would serve no useful purpose to detail all of the criticisms which defendant’s witnesses made upon the method used by plaintiff’s experts. It is not necessary that we should determine just how far these criticisms were justified. It is sufficient to say that defendant’s witnesses declared that the methods used by plaintiff’s witnesses would produce entirely incorrect results and presented calculations to support their statements. These witnesses for defendant were apparently as skillful, expert, and experienced accountants as those who testified for the plaintiff. We doubt very much whether either set of experts were entirely right in their conclusions and certainly both can not be right. We can only say that their testimony is so materially in conflict that we are unable to reach any definite conclusion therefrom. The burden of proof was upon the plaintiff to establish by a preponderance of the evidence the loss or depreciation of market value in relation to the plant. By the preponderance of the evidence is not meant the greater number of witnesses, but rather that evidence which is the more convincing to the mind, and of the truth of which the court or jury is the better satisfied. Plaintiff has failed to sustain this burden, *130 and, if we are correct in this finding, it is sufficient to prevent a recovery for depreciation of value of the plant.
We can not discuss in detail the evidence which was introduced to show the amount of loss or depreciation in value on the machinery. The testimony of plaintiff’s witnesses on this point is subject in some respects to the same objections as their testimony with reference to the amount of depreciation of the plant, but defendant’s witnesses proceed on the same general theory and to a certain extent make the same calculation. Where they differ in method, their evidence is not at all satisfactory, and there is therefore nothing to rebut the testimony of plaintiff’s witnesses. We also think there are some facts testified to by plaintiff’s witnesses that may be used to determine this depreciation. One thing is clear from all the evidence, namely, that the value of the machinery was greatly appreciated in the forepart of the year 1917, by reason of the war and the entrance of this country into it, and that its value was greatly depreciated in 1919 by reason of the cessation of the war. Necessarily, the difference between the market value thereof on April 1, 1917, and April 1, 1919, or about those dates, was very large. While the testimony of plaintiff’s witnesses as to the amount is not very convincing for the reason that in part it took into consideration matters which were not a proper basis for forming an estimate of market value, if. it is considered at all, there was nothing to refute it in the testimony of defendant’s witnesses. On the other hand, the unquestioned facts as to depreciation of that class of machinery during the period in question tend somewhat to support it. We have, therefore, accepted the ultimate conclusion of the plaintiff’s witnesses and found the amount of depreciation on the' machinery to be $633,847. This, of course, is not exact, but evidence on value is generally an approximation. This depreciation of value, however, includes ordinary depreciation for wear and tear for which plaintiff had already been paid. While the evidence shows the total amount of this ordinary depreciation that was paid on both plant and machinery, it fails to show the amount paid on either separately. If the amount of ordi *131 nary depreciation on the plant alone had been shown by the evidence, we could find the amount of ordinary depreciation on the machinery by simply subtracting the depreciation on the plant from the total amount of the depreciation; but as the amount of depreciation on the plant alone is not given, we are unable to find from the evidence, the amount of the machinery depreciation for wear and tear.
Notwithstanding these findings, again we prefer to rest the judgment which will be rendered in the case on the construction of the provisions of the contract with reference to plaintiff’s remedies in case a conflict arose between plaintiff and defendant as to the amount of plaintiff’s reimbursement or the meaning of the contract. This question will be discussed further on in connection with the claim of the plaintiff for profit on the cost of unworked material.
PROFIT ON UNWORKED MATERIAL
The plaintiff claims 10 per cent profit on the unworked material; that is, the material which was purchased by either party for use in carrying out the contracts, but which, on account of the cancellation thereof or for some other reason, was never actually used in the process of manufacture. Counsel for defendant concede the legal basis for this claim, but insist it is not supported by the evidence and contend that the evidence does not show the amount of unworked material which should be allocated to the contracts in suit; that even if this be shown, there is no proof that such profit has not been paid; and finally, that the evidence shows that the plaintiff was paid profit on that portion of the unworked material which it purchased, and that there is no evidence by which it can be determined what amount the defendant furnished in order to compute the profit thereon.
It might seem that there would be no difficulty in determining these questions of fact, but unfortunately the evidence does not show definitely the course of business between the parties with respect to these matters. It does appear that the plaintiff was paid for all the material which it furnished, and was also paid storage and the cost *132 of handling the same with a profit, and that it received a profit on all material that actually entered into the process of manufacture. It also appears that all of the material which was furnished by either party went into a storehouse on the premises of plaintiff, which storehouse was in charge of Government officials; that this material so placed in the storehouse was not segregated as to the different contracts; and that some portions of it were in bulk. Plaintiff checked out of this storehouse material for the purpose of manufacture as it was needed. But there is no satisfactory evidence as to whether plaintiff was paid a profit on the material which it furnished on presentation of invoice thereof and before such material went into the storehouse or whether, on the other hand, a profit was simply paid on all material actually used in work on the contract as it was checked out of the storehouse — in fact, no direct evidence whatever, on this point, although it would seem such evidence would have been easy to obtain, at least on the part of the defendant. Two witnesses for plaintiff testify directly that plaintiff was not paid any profit on the un-worked material, and we do not think this evidence is overcome by some indefinite statements of a witness of defendant and other circumstances of the case. The fact that if the Government’s books were properly kept it would have been easy for the defendant to show any payments that were in fact made, puts a weight in the scale against defendant in determining the preponderance of the evidence. The Government did produce a list of payments made for material and profits, but there is nothing in the evidence to show whether any of these payments applied to the un-worked material. On the whole, we think the preponderance of the evidence shows that no profit was paid on the unworked material, but whether paid or not apparently plaintiff did not at the time of cancellation, or at the time when a partial settlement was made, consider that anything was due with reference to the unworked material, for no mention of the matter was made until long after its claims had been presented to the Government board for consideration.
*133 In this connection it ought to be said that while counsel for defendant concede that plaintiff is correct in construing the contract to require a profit to be paid on all of the unworked material, the court is not inclined to make such a concession with reference to materials furnished by defendant.
Subdivision (b) of Article XI of the contract provided that “ the contractor shall be paid as profits ten per cent (10%) upon all sums paid or payable to the contractor upon any account under any of the provisions of the contract.” So far as this provision is concerned, we think it must be construed to entitle the plaintiff to a profit on that portion of the unworked material which it purchased; but so far as the portion furnished by the defendant is concerned, the provisions of the contract were different and were in substance and effect that a 10 per cent profit should be paid “ upon the cost of materials * * furnished by the Government for the purpose of the contract.” We think that “ furnished by the Government for the purpose of the contract ” does not mean simply bought by the Government and put in a storehouse in charge of its agents. Up until the time when it was checked out for use in manufacture this property was owned by the Government, and we think it was not furnished for the purpose of the contract until it was turned over to plaintiff to be used in completing the contract. This construction becomes important when we consider the condition of the evidence. While counsel for defendant strenuously contended that there is no evidence showing the amount of unworked material which could properly be allocated to the contracts in suit, we have found to the contrary (see Finding XXIV). But, for the reasons above stated, we think that the plaintiff is not entitled to a profit on the material furnished by the defendant, and there is no evidence under which segregation can be made of the amount of unworked material on hand separately furnished by either party. In other words, there is no evidence to show how much of the unworked material, if any, had been purchased by plaintiff. This would'prevent plaintiff from a recovery on this branch of the case, but *134 we prefer to rest our decision upon another and, as we think, very complete defense to the whole of the case of plaintiff, which defense will next be stated and discussed.
There still remains the question as to whether plaintiff, by failing to pursue the remedy provided for in the contract in case there should be any dispute as to the amount of its reimbursement or the construction of the contract, has not lost any right which it might have had to recover for the items which has heretofore been considered by reason of its failure to take up these matters with the defendant in accordance with the terms of the contract. Article XV of the contract provides that a compensation board shall be appointed:
“ For the determining of all questions arising in respect of the amounts of reimbursement or for payments including profits to the contractor, * * * ”;
and also provides:
“ The decisions of the said board, or a majority thereof, shall be binding on both parties to this contract, subject to the approval of the contracting officer.”
On July 24, 1917, a compensation board was appointed in accordance with this provision, the Ordnance Claims Board being so designated. The plaintiff was informed of its creation and personnel and, by its officers, appeared before said board from time to time. The Government installed a cost-accounting organization at the plant of plaintiff, and the plaintiff also had its cost-accounting organization. Costs, charges, and credits so certified were mutually determined and certified to by the cost-accounting- organizations of both parties. Items not mutually agreed upon were referred to higher officials of the parties for determination before certification for public vouchers. In this way the vouchers for the amount due were certified to be correct by officials of both plaintiff and defendant. The value of plaintiff’s investment in plant and equipment actually used in the performance of each contract was mutually arrived at between plaintiff and defendant, and a depreciation allowance for each month was computed and agreed upon. In this way ordinary depreciation, wear and tear *135 on the plant, has all been allowed, and over $385,000 has been paid therefor by the Government, together with a further allowance for accelerated depreciation. There is nothing to show that at that time the plaintiff made any claim for depreciation of values, although the ordinary depreciation was computed each month. As shown by the findings, it was not until over a year after the contract was completed when the plaintiff first made to defendant a claim for anything corresponding to the claim for depreciation of values which it now makes. On January 24, 1920, the plaintiff, by letter, presented a claim “ for amortization or exceptional depreciation of special plant in accordance with paragraph 40 of ‘ Definition of Costs Pertaining to Contracts,’ issued by the War Department June 27th, 1917.” This claim was for 1917 and 1918 in separate items and aggregated $287,583.34, and was on cost-plus contracts Nos. 14067 and 14627. By letter of May 12, 1920, this claim was raised to $314,840.23, and in a letter to the Bridgeport district ordnance office claims board the same amount was claimed on these two contracts, and a total amount of depreciation of value on all cost-plus contracts was claimed in the sum of $630,478.99. On September 27, 1920, plaintiff presented the same claims to the Bridgeport district ordnance claims board, but the total sum thereof was increased to $693,526.88, and the amount claimed on contract No. 14067 was $346,324.25. This claim was disallowed and the decision affirmed by the War Department Claims Board, from which plaintiff took an appeal to the appeal section of the War Department Claims Board, which also denied relief, and plaintiff appealed therefrom to the Secretary of War. The Secretary of War returned the case to the appeal section for a rehearing, which was held under General Orders, No. 103. The claim was again denied in full, and on appeal to the Secretary of War was finally disallowed by him on June 2, 1921.
It Avill be seen from what has been stated above, that as the work progressed the plaintiff was paid depreciation in an amount agreed upon between its officials and those of the defendants without any suggestion of the claim now *136 made. In Joice v. United States, 51 C. Cls. 439, 445, it was said:
' “ Upon several- of said vouchers or statements of account were items showing the very pieces of lumber which this case concerns. Upon each of said vouchers the plaintiff certified and signed a certificate that the account was correct and unpaid. He was paid accordingly and received final payment as stated. He made no protest, did not object to any payments being otherwise than they purported to be, and received and collected the final payment which was made, as the others were, by check, which purported to be in full of the amount stated in the voucher. The final payment was received in August, and he presented the claim here sued upon to the War Department in March of the following year, more than six months after the matter had been closed. ‘It is therefore plain that the interpretation he now puts on his contract is an afterthought and is not the interpretation put upon it by the parties when it was executed ’ or when it was performed. Merriam case, 107 U. S. 478, 484.”
The last sentence of the above quotation seems to be particularly applicable to the situation in the case at bar.
In the case of Poole Engineering Co. v. United States, 57 C. Cls. 232, 234, the court said with reference to payments in settlements:
“ If there are claims on the part of the contractor which affect the amount due and payable to him under the terms of the contract, or for an alleged breach of it, they should be asserted at or before the time a settlement is made. The' Government is entitled to know, when it makes what it believes to be a final payment on its contract, what claims a contractor intends to assert against it on account of the contract. * * * It has been frequently said that if a party keeps silent when he ought to speak he will not be-heard thereafter to speak when he ought to remain silent.”
If the doctrine of these cases be applied, it would seem that the plaintiff was precluded from making any further-claim, but this is not all. About a year after the whole matter had apparently been settled, it made the claim now asserted in the petition; presented it as required by the contract to a compensation board; and the decision of this board being adverse, took appeals to various other boards- and officers, all of which resulted in an adverse decision. *137 Plaintiff now claims that all this amounted to nothing because under the contract the decision of the compensation board was “subject to the approval of the contracting officer,” and such approval was never obtained. Universal experience would justify us in saying that if the decision had been in favor of the plaintiff it would have insisted that the Government was bound by it. However that may be, we very much doubt whether plaintiff can now be heard to say that the proceedings had no force or effect. They were not, it is true, strictly in accordance with the terms of the contract, but they were had and taken on the voluntary motion of the plaintiff without any request for other or different action. It is said that after the claim had twice been disallowed and plaintiff had taken an appeal to the Secretary of War, the Secretary returned the case to the appeal section for a rehearing, which rehearing was heard under General Orders, No. 103. Plaintiff urges that it did not know that the case was so heard. We think it must have known, because the first sentence of the findings of the board so states, but we are at loss to understand how it is material in any event. The full decision of the board shows that plaintiff’s claim was heard and decided upon its merits, the decision of the board being in substance that the contract, when properly construed, covered no such claim as plaintiff presented. Plaintiff must have understood perfectly that the proceeding was not in accordance with the provisions of the contract, but without objection proceeded to present its case. The controlling fact is that at no time did plaintiff ask or seek in any way to have its claim presented in the manner provided for by the contract.
Counsel for defendant insists that the plaintiff has waived its right to insist on the terms of the contract and is estopped from objecting to the form or manner of the proceedings on the hearing of its claim, and could have cited in support of this application of the law Bowe v. United States, 42 Fed. 761, wherein it is said that such conduct was a fraud on the Government officials, but it is not necessary for us to go so far. Conceding that the claim of plaintiff was not passed upon in the manner provided for in the contract, the evidence fails to show that the plaintiff ever requested *138 or even suggested that the decision of the board should be approved by the contracting officer. On the contrary, it is a fair inference from the evidence that at the time the plaintiff completely acquiesced therein. Having failed to present its claim or even ask that it be considered in the manner fixed by the contract, it can not now be permitted for the first time to ask that it be heard in this court. See Bray, Trustee, v. United States, 46 C. Cls. 132, 139; Fitzgibbon v. United States, 52 C. Cls. 164, 169, and cases cited; and Lustbader Construction Co. v. United States, 62 C. Cls. 549, 563. As applied to this particular case, there are other reasons that support the rule above stated. It is quite evident that the parties did not intend that the contract should be so construed that the plaintiff could invoke hearings and proceedings on its claim and claim the benefit of the decision if it was favorable and if unfavorable urge that the proceedings had not been strictly in accordance with the contract. Such a construction simply nullifies the provision of the contract with reference to the submission of plaintiff’s claim, for its force and effect would depend entirely upon the will or wish of plaintiff. If plaintiff intended to rely upon the provisions of the contract with reference to how its claims should be submitted, it should have made a request accordingly, or at least offered to submit its claim in the manner thus provided.
We have not overlooked that the plaintiff in the same letter by which it took an appeal from the decision of the War Department Claims Board to the appeal section of the War Department Claims Board, included a paragraph as follows:
“(g) The contractor is reserving to itself in this procedure all its rights of procedure -under its said contracts and is in this appeal conforming to the rules laid down by the department as it understands them.”
But there was nothing in the letter stating what plaintiff claimed these rights to be, or any suggestion that some other or different proceedings be had, if indeed it was not then too late for such a request to be considered. At the most, this statement was .merely an intimation that if the decision .eventually reached on appeal was favorable to the plaintiff *139 it would accept it; if not, it would try some other proceeding. The statement made in the letter does not take plaintiff’s case out of the rule laid down in the cases cited above. The plaintiff therefore can not recover on its claim for additional depi'eciation.
The situation with reference to plaintiff’s claim for 10 per cent profit on unworked material is somewhat different but no better. It was not presented along with the claim for depreciation in values to the various Government boards and officials, and does not appear to have ever been heard of by defendant until about five and a half years after the contract had been canceled when it was presented to the Secretary of War, presumably under the provisions of Article XVIII, to which reference will hereinafter be made. The Secretary of War denied the claim without prejudice for a certain reason; in other words, did not decide the claim. It does not follow, however, that the plaintiff is not precluded as to the claim for unworked material by the provisions of the contract. Article XVIII provided that if any doubts or disputes arose as to the meaning of anything in the contract, “the matter shall be referred at once to the Chief of Ordnance, United States Army, for determination.” The contractor, however, had the right to submit this decision to the Secretary of War, whose decision (the contract recites) “ shall be final.”
The contractor, therefore, did not proceed in accordance with Article XVIII in submitting this claim to the Secretary of War, for plaintiff not only did not submit its claim “ at once,” but did not refer it at all to the Chief of Ordnance, nor did it submit its claim under Article XV, which would seem to also apply, for whether it involved a question of the meaning of the contract, it certainly involved “the amounts of reimbursement or for payments including profits to the contractor.” Under the rules heretofore laid down, the plaintiff, having failed to submit its claim in the manner required by the contract, can not recover any further profit on hnworked material.
It follows from what has been said above that the plaintiff is not entitled to recover on any of the claims made in *140 its petition, and it is accordingly ordered that its petition be dismissed.
Williams, Judge, and Littleton, Judge, concur.
Whaley, Judge, did not hear this case and took no part in its decision.